**Opinion issued July 9, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-22-00373-CV**

———————————

**OXY USA WTP LP, Appellant**

**V.**

**BENJAMIN MENDEZ BRINGAS, MANUEL MENDEZ BRINGAS, AND RENE MENDEZ BRINGAS, Appellees**

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-87047**

# O P I N I O N

This is a permissive appeal of an order denying summary judgment in a tort suit.[1] An independent contractor was electrocuted while exchanging waste bins at a

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f).

remote oilfield site when the trailer of the truck used to lift the waste bins hit an overhead power line, which the independent contractor claimed he could not see because it was dark and the waste-bin area was not lighted. The independent contractor sued the station owner, alleging that the owner was negligent in (1) failing to warn of the dangers of placing the waste bins near unlit, energized power lines, (2) authorizing the work to take place at night, and (3) violating statutory requirements for temporarily de-energizing the power lines during the work. The station owner moved for summary judgment on the duty element of the negligence claims. The trial court denied summary judgment but granted permission to appeal, and we accepted the appeal. Because we conclude the owner owed no duty to the independent contractor under any negligence theory, we reverse and render judgment for the owner.

## I. Background

Oxy USA WTP LP ("Oxy") owns and operates the Barilla Draw Compressor Station ("Barilla Draw")—a remote, unmanned oil-and-gas facility in the Permian Basin. In January 2019, Oxy contracted with Petro Waste Environmental, LP ("Petro Waste") to supply and service bins for waste generated at the Barilla Draw and other Oxy facilities. Oxy told Petro Waste by email that if Petro Waste would let Oxy know when the waste bins shipped, Oxy would "arrange for one of our guys to escort them to location."

2

When Petro Waste later delivered slide-top waste bins to the Barillo Draw in February 2019, no Oxy representative was present. Instead, Oxy's station operator, Ramiro Maltos, gave some instructions on where the bins should be placed based on his knowledge of the site. Asked if he had gone to the Barilla Draw to identify specific locations for the bins, he answered: "No, sir. I know that site pretty well. I pretty much just gave instruction." He said:

> I told the operator to make sure that the bins were in an area where, if needed to work on any process equipment, they would not be in the way. There's the truck turnaround that gets used there on the south side of . . . the compressor station. I told them to make sure that they would not obstruct the trucks turning around. I told them there's a pipeline on the south and the north side, to make sure . . . they were not parked anywhere over those pipelines. There's a pipeline right-of-way south of the compressor station. I told them to make sure not to park on the pipeline right-of-way. And I told them to stay clear of all . . . power lines in that vicinity.

Although Maltos acknowledged he had input on the bin placement, he denied responsibility for ensuring the bins were placed in a safe location. He explained that bin placement was decided with the delivery drivers. Further, Maltos said, Oxy "hire[s] people to do this because . . . that's their, you know, area of expertise." Oxy's corporate representative similarly testified that Oxy "would not specifically have told [the drivers] where to put [a bin]." Instead, Oxy would have given some general instructions—such as to place the bins in "a rough area, not exactly here or right here, but more specifically as to kind of away from the compressors over there, put them on the pad, not in the pasture . . . just kind of not very specific

3

guidelines"—but would rely on the drivers to place them. Representatives of Petro Waste's successor, Waste Management, confirmed that Oxy coordinated with the delivery drivers on bin placement.

The waste bins ultimately were placed in an unlit area at the back of the Barilla Draw, away from the facility's process equipment. The bins were near, but not directly underneath, high-voltage overhead power lines.[2]

About seven months after the slide-top waste bins were delivered to the various Oxy facilities, Petro Waste asked to replace them with open-top waste bins. Petro Waste wanted to use slide-top bins at other job sites but had a low inventory. Oxy agreed to allow the swap, and Petro Waste agreed not to charge Oxy a fee to deliver the open-top waste bins.

Petro Waste used a subcontractor—Madison Materials, LLC ("Madison")— for the swap. The Master Service Agreement between Petro Waste and Madison

---

[2] The record does not make clear the distance between the bins and the powerlines. Though it is not evidence, Oxy's counterclaim against the independent contractor for circular indemnity under Chapter 752 alleges that the bin-swapping work "was performed in close proximity to (less than six feet from) a high voltage overhead power line." *See* TEX. HEALTH & SAFETY CODE §§ 752.001–.008 (governing work within prescribed distances of high-voltage, overhead power lines); *see also id.* § 751.008 ("If a violation of this chapter results in physical or electrical contact with a high-voltage overhead power line, the person, firm, corporation, or association that committed the violation is liable to the owner or operator of the line for all damages to the facilities and for all liability that the owner or operator incurs as a result of the contact."); *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 356–57 (Tex. App.—Houston [1st Dist.] 2012, ) ("Generally, a party's pleadings do not constitute summary-judgment evidence."). Oxy later nonsuited its counterclaim.

recites that Madison is "in the business of providing oilfield transportation services" and provides such services to Petro Waste "as an independent contractor." Petro Waste contacted Madison around 11:00 a.m. on September 19, 2019, and gave Madison's contract dispatcher, Edgar Zapata, the names and GPS coordinates of the Oxy facilities for the bin swap out. Zapata then contacted Benjamin Bringas, who was working with his brother, Manuel Bringas, as independent waste hauling contractors for Dennis Romo d/b/a DJR Logistics.

The Bringas brothers were dispatched to swap out the waste bins at several Oxy facilities, including the Barilla Draw. They arrived at the Barilla Draw between 12:00 and 2:00 a.m., when it was dark. Benjamin and his other brother Rene—who was not an employee or independent contractor of Dennis Romo but was being trained by his brothers—arrived in one truck. Manuel arrived shortly after in a separate truck. They had limited experience with the type of waste bins at the Barrilla Draw because Oxy was Petro Waste's only customer to use that type of bin at a compressor station.

Additionally, they had never been to the Barrilla Draw before and were not escorted by any Oxy employee. They did not know if the Barilla Draw would have any lights. When they arrived, (a) there were some lights in the area of the compressors but the bins were not illuminated, (b) they left the headlights of their trucks on, (c) they had a light or lamp on the back of their truck to illuminate the

5

tools they worked with, (d) there were lights on the helmets they were wearing, and (e) they had a flashlight Rene brought. Although they tried to identify any hazards, it was "very dark," they "couldn't see much," and there was "not enough light" for them to see whether there were power lines overhead.

They successfully swapped one bin. While loading the second slide-top bin onto Manuel's truck, however, the tilt frame on the trailer contacted the energized overhead power line.[3] Benjamin was electrocuted. Manuel and Rene called 911 and kept Benjamin alive while they waited for a life-flight to a medical center in Lubbock. Benjamin survived but sustained severe injuries.

The Bringas brothers sued Oxy and alleged three negligence theories—premises defect, negligent activity, and negligence per se.[4] They alleged that, as the owner and operator of the Barilla Draw and the power lines there, Oxy had a legal duty to warn of dangerous conditions that were not open and obvious and had breached that duty by among other things:

---

[3] Manuel was in the truck's driver's seat, and Rene was operating the controls for the trailer that lifted into the air as part of the process of picking up the waste bins. Benjamin was standing near the end of the trailer by the waste bin they were retrieving. Rene explained that the person at the controls decides how high to lift the trailer.

[4] They also alleged claims against Petro Waste and its successor Waste Management. But Waste Management was non-suited, and Petro Waste is not before us in this interlocutory appeal.

- Creating a dangerous condition when it selected the location for the bins.

- Failing to warn individuals of the presence of overhead power lines at the Barilla Draw, particularly when individuals are asked to perform work at night and Oxy knows or should know that the overhead power lines are not an open or obvious hazard.

They also asserted that Oxy's acts or omissions in not preventing contact with the power lines had violated Chapter 752 of the Texas Health and Safety Code, which regulates work within prescribed distances of high-voltage overhead lines. *See* TEX. HEALTH & SAFETY CODE § 752.001–.008. And that Oxy's failure to do so was negligent per se. Benjamin sought to recover for his injuries, and Manuel and Rene sought bystander recoveries.

Oxy moved for traditional and no-evidence summary judgment on all claims. Oxy argued that "the conditions [of the premises] alleged by [the Bringas brothers] to be dangerous (overhead power lines, position of waste bins, inadequate lighting or darkness) are not the sort of existing premises conditions that are dangerous in and of themselves; instead, the alleged premises defects were created by the [Bringas brothers'] work as employees of an independent contractor." Because the Bringas brothers conducted the activity at issue—retrieving and replacing waste bins—as independent contractors, Oxy did not have a legal duty to ensure they performed the work safely absent evidence that it retained the right to control, or actually exercised control over, the work.

Oxy also argued that the Bringas brothers did not have a viable negligent activity claim because they did not allege or have evidence of any affirmative, contemporaneous activity by Oxy that caused Benjamin's injuries. Finally, Oxy argued that the negligence per se claim should also be dismissed because Oxy was not a "person responsible" under Chapter 752 for the Bringas brothers' temporary work near the power lines.

The Bringas brothers responded, referencing the evidence of Oxy's involvement in the placement of the bins near the power lines. They also pointed to evidence that they claimed created material fact issues on whether Oxy had "green lighted" the work to be done when it was dark and the Bringas brothers could not see the power lines or how close the waste bins were to the power lines. The Bringas brothers did not directly address their negligence per se claim in their summary judgment response, though they argued that Oxy retained control over their work because it was a person responsible for that work under Chapter 752.

The trial court denied Oxy's summary judgment motion in its entirety but granted permission to appeal based on its conclusion that the order involved controlling questions of law. Specifically, the trial court found that there was a substantial ground for difference of opinion on two controlling questions:

- Which category of premises defect this case falls within, and
- Whether the alleged dangerous condition was open and obvious.

The first question references the distinction between premise defect cases involving preexisting conditions dangerous in their own right (category-one cases) and those involving conditions that became dangerous because of the independent contractors' work activity (category-two cases). The trial court determined that the Bringas brothers alleged a category-one case because the alleged defect—"the location of the waste bins and their proximity to the overhead power[] lines"—was "inherently dangerous in its own right," and not "created by [the Bringas brothers'] own work activity." The trial court noted the question was controlling because it determined the duty, if any, Oxy owed to the Bringas brothers:

> [I]f this is a category two premises defect case, then Oxy owed no duty to the [Bringas brothers] in the absence of any evidence that Oxy retained or exercised control of the details of [their] work, but if this is a category one premises defect case, then whether Oxy retained or exercised control over the [Bringas brothers'] work is not relevant to [their] premises liability claim.

On the second question, the trial court concluded that "the danger [the Bringas brothers] faced, including, but not limited to, the dynamic, round-the-clock nature of the petroleum-related work environment in the Permian Basin, the presence of the energized, high-voltage overhead power lines in close proximity to the roll-off dumpsters, in the (former) truck turnaround area, was not a danger so open and obvious that the [Bringas brothers] will be treated with its appreciation as a matter of law." The trial court further concluded that "[a]ny openness and obviousness of

9

the danger, perhaps only so in daylight, was not sufficient to make the premises reasonably safe, around-the-clock, as a matter of law."

The trial court also concluded that an immediate appeal of its summary judgment order might materially advance the ultimate termination of the litigation because an appeal "could potentially eliminate all or a substantial part of the [Bringas brothers'] claims against Oxy, including the premises liability claim."

This Court then granted Oxy's petition for permissive appeal.

## II. Scope of the Appeal

While appeals are often taken from a final judgment, the Legislature has enacted "a comprehensive interlocutory appeals statute to allow certain appeals before final judgment when public policy dictates." *Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725, 736 (Tex. 2019); *see* TEX. CIV. PRAC. & REM. CODE § 51.014. Relevant here, "an interlocutory appeal can be taken from any order that 'involves a controlling question of law as to which there is a substantial ground for difference of opinion' if permitted by the trial court, accepted by the court of appeals, and 'an immediate appeal . . . may materially advance the ultimate termination of the litigation.'" *Dallas Symphony Ass'n v. Reyes*, 571 S.W.3d 753, 759 (Tex. 2019) (quoting TEX. CIV. PRAC. & REM. CODE § 51.014(d)–(f)). When these requirements are met, granting a permissive appeal spares litigants and courts "the inevitable inefficiencies of the final judgment rule in favor of early, efficient

resolution of controlling, uncertain issues of law that are important to the outcome of the litigation." *Sabre Travel*, 567 S.W.3d at 732.

The Texas Supreme Court has clarified the scope of review for permissive interlocutory appeals. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137 (Tex. 2022). An appellate court that accepts a permissive interlocutory appeal "should do what the Legislature has authorized and 'address the merits of the legal issues certified.'" *Id.* at 147 (quoting *Sabra Travel*, 567 S.W.3d at 733). This includes "addressing all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue." *Id.* While a controlling legal issue must be involved to secure a permissive appeal, the order itself is on appeal, and the Rules of Appellate Procedure preclude strict construction of issues presented on appeal. *See id.* (interpreting plain language of TEX. CIV. PRAC. & REM. CODE § 51.014(d)); *see also* TEX. R. APP. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

## III. Discussion

Oxy contends the trial court erred by denying summary judgment on the Bringas brothers' claims that alleged a premises defect, negligent activity, and

negligence per se. We consider each claim, as appropriate, under the scope of this permissive appeal.

## A.     Summary-judgment standard of review

We review the trial court's summary-judgment ruling de novo. *See Henkel v. Norman*, 441 S.W.3d 249, 250 (Tex. 2014) (per curiam). In doing so, we examine the record in a light most favorable to the nonmovant and indulge every reasonable inference against the motion. *See id.*

Relevant here, a defendant is entitled to a traditional summary judgment if it conclusively negates at least one essential element of the plaintiff's cause of action. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014) (per curiam). If the summary-judgment motion and evidence facially establish the defendant's entitlement to judgment as a matter of law, the burden shifts to the plaintiff to raise a genuine issue of material fact. *Phillips v. Abraham*, 517 S.W.3d 355, 359 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A genuine issue of material fact exists if reasonable and fair-minded jurors could differ in their conclusions, considering all the summary-judgment evidence. *Id*.

After adequate time for discovery, a defendant may also move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim on which the plaintiff would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). A no-evidence summary judgment is essentially a pretrial directed

verdict, to which we apply the same legal sufficiency standard of review. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003); *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2001, no pet.). To defeat a defendant's no-evidence motion, the plaintiff must produce evidence raising a genuine issue of material fact as to the challenged elements of its claim. *See* TEX. R. CIV. P. 166a(i); *see also Ford Motor Co. v Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Evidence so weak as to do no more than create a mere surmise or suspicion does not create a fact issue. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014).

## B.     Character of the Bringas brothers' claim

The Bringas brothers seek to hold Oxy liable under several theories of negligence—premises defect, negligent activity, and negligence per se. In any negligence case, duty is the threshold inquiry. *See Elephant Ins.*, 644 S.W.3d at 144; *Hillis v. McCall*, 602 S.W.3d 436, 440 (Tex. 2020). The Texas Supreme Court has described this inquiry as "encompass[ing] several questions of law: the existence, scope, and elements of a duty." *Elephant Ins.*, 644 S.W.3d at 144. Each of these components is implicated here in the questions certified by the trial court. That is, the certified questions about the categorization of the alleged dangerous condition and whether it was open and obvious concern the existence, scope, and elements of the duty, if any, owed by Oxy to the Bringas brothers. *E.g.*, *Sandridge Energy, Inc.*

*v. Barfield*, 642 S.W.3d 560, 563 (Tex. 2022) (premises owner's duty to make safe or warn against dangerous conditions does not extend to conditions that are open and obvious); *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225–26 (Tex. 1999) (noting there are two categories of premises defects as it relates to independent contractor on premises and that owner has duty to warn independent contractor of dangerous conditions in first category but not in second category, unless owner has right to control or actually controls independent contractor's work).

A person injured on another's property may have either a negligence claim or a premises liability claim against the property owner. *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016). In failing to keep the premises safe, one in control of premises may be liable for negligence arising from a negligent activity on the premises and that arising from a premises defect. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). Whether a particular case involves a negligent activity or a premises defect is a question of law. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 470–73 (Tex. 2017); *see also Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606–07 (Tex. 2002) (comparing and contrasting both types of cases in summary judgment context); *Coastal Marine*, 988 S.W.2d at 225 (same; further citing supreme court's legal conclusions categorizing case as one type or another in analogous, directed-verdict context); *Olivo*, 952

S.W.2d at 527 (rejecting "negligent activity" category and categorizing case as involving "premises defect").

Although both negligent activity and premises defect claims are based on negligence principles, they are independent theories of liability. *See Olivo*, 952 S.W.2d at 529. A negligent activity claim requires that a person's injury result from a contemporaneous activity, while a premises defect claim is based on the property itself or a condition of the property being unsafe. *See id.* at 527; *Harris Cnty. Flood Control Dist. v. Halstead*, 650 S.W.3d 707, 713 (Tex. App.—Houston [14th Dist.] 2022, no pet.). If a person is injured because of a condition of the premises, rather than by any ongoing conduct occurring at the time of injury, his recovery is limited to a premises defect cause of action. *E.I. DuPont de Nemours & Co. v. Roye*, 447 S.W.3d 48, 56–57 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd by agr.); *see Olivo*, 952 S.W.2d at 527. "[U]nder a single set of alleged facts, a party cannot recover under both theories because they are governed by different standards and elements of proof." *Halstead*, 650 S.W.3d at 714; *but see Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 215–17 (Tex. 2015) (recognizing that injury may have more than one proximate cause and thus involve more than one duty in case separately examining duty owed by defendant as premises owner and as injured party's employer).

In contrast, negligence per se is not an independent cause of action. *Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). It is "merely one method of proving a breach of duty, a requisite element of any negligence cause of action." *Id.* (emphasis omitted). The crux of a negligence per se claim is whether the defendant violated a statutory duty it owed to the plaintiff under the circumstances and whether that violation proximately caused the plaintiff's injuries. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985).

## C.      Oxy is entitled to summary judgment on the premises defect claim

Oxy moved for summary judgment on the ground that premises defect, rather than negligent activity, principles control the duty inquiry here. In premises defect cases, there are two subcategories of defects for which an independent contractor may seek to hold the premises owner liable: defects (1) existing on the premises when the independent contractor entered the location ("category-one" defects) and (2) created by the independent contractor's work activity ("category-two" defects). *See Bright*, 89 S.W.3d at 605–06 (citing *Coastal Marine*, 988 S.W.2d at 225). "Only concealed hazards—dangerous in their own right and independent of action by another—that are in existence when the independent contractor enters the premises fall into this first subcategory of premises defects." *Coastal Marine*, 988 S.W.2d at 225. Under the second subcategory, the independent contractor's work activity

16

creates the hazard—that is, the defect poses no danger until the independent contractor activates its dangerousness. *See id.*

When the defect relates to the independent contractor's work activity, the premises owner generally owes no duty to the independent contractor, unless the premises owner exercises control over the independent contractor's work and fails to use reasonable care. *See Bright*, 89 S.W.3d at 606 (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). The premises owner's role must be more than a general right to order the work to start or stop, to inspect progress, or to receive reports. *Id.* (citing *Redinger*, 689 S.W.2d at 418); *see Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015).

In granting permission to appeal, the trial court concluded that the alleged dangerous condition—"the location of the waste bins and their proximity to the overhead power[] lines"—is a category-one defect because it was preexisting and dangerous in its own right. Oxy says the trial court's conclusion is erroneous and that, instead, this is a category-two case because the condition only became dangerous because of the Bringas brothers' work activity. And as for the category-two claim, Oxy says, it owed no legal duty to the Bringas brothers because it did not retain or exercise control over the details of their work.

The Bringas brothers respond that no matter if the premises defect claim involves a category-one or category-two defect, Oxy owed them a duty because it

"had knowledge of and controlled (1) where the bins were placed, (2) when Bringas moved them, and (3) whether the power lines were illuminated or energized at the time." Additionally, they argue that any distinction between a category-one and category-two case is a distinction without meaning here because Oxy had the right—and indeed the obligation to—control the work being performed in proximity to the power lines under Chapter 752 of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE §§ 752.001–.008. They assert that if Oxy is "'responsible for having workers near power lines,' then [it] also necessarily maintained some control over the work and the worksite."

### 1. The Bringas brothers allege a category-two premises defect

In determining whether this is a category-one or category-two premises defect case, we look to this Court's own precedent recognizing that "power lines are not inherently dangerous in themselves" but "may become dangerous because of the manner in which independent contractors who come on premises perform their work duties." *See Wood v. Phonoscope, Ltd.*, No. 01-00-01054-CV, 2004 WL 1172900, at *4 (Tex. App.—Houston [1st] May 27, 2004, no pet.) (mem. op.); *see also Corpus v. K-J Oil Co.*, 720 S.W.2d 672, 674 (Tex. App.—Austin 1986, writ ref'd n.r.e.) ("The highline, as constructed, did not become dangerous to those working below until the foreman . . . caused the work-over rig's boom to come in contact or close proximity with the highline"). In *Phonoscope*, a cable-television-services

18

company hired an independent contractor to install new fiber-optic cable on property on which it had a right-of-way ownership. *Phonoscope*, 2004 WL 1172900, at *1. The independent contractor, in turn, hired a subcontractor for the installation work, and the subcontractor's employee sustained serious electrical burns when his bucket truck touched a power line. *Id.* at *1. The trial court granted summary judgment for the easement owner on no-duty grounds, which this Court affirmed. *Id.* at *1, 4, 8. The Court held that the danger did not arise from a category-one defect (i.e., a concealed pre-existing condition dangerous in its own right) but arose from the subcontractor's own work near the power lines. *Id.* at *4 (noting "[w]ell-settled Texas law" recognizing that "power lines are not inherently dangerous in themselves" but "may become dangerous because of the manner in which independent contractors who come on premises perform their work duties").

The Bringas brothers argue that Oxy's involvement in placing the bins "perilously close" to the power lines precludes us from applying *Phonoscope* to reach same conclusion here. But our sister court rejected a similar argument in *McCaughtry v. Barwood Homes Ass'n*, 981 S.W.2d 325, 327 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). There, the premises owner hired an independent contractor to paint light poles surrounding a tennis court. The poles were about nine feet from a high-voltage power line that was at the same height as the top of the light poles. *Id.* at 327. The plaintiff worked for the independent contractor. *Id.* While he

was painting the light pole, the handle of his paint roller contacted the high-voltage power line, causing injury. *Id.* The plaintiff argued on appeal that a summary judgment for the owner should be reversed because the owner did not show that it warned of the proximity of the light pole to the high-voltage power line. *Id.* at 329–30. According to the plaintiff, the owner "knew of the danger of a high voltage power line being adjacent to and within nine or nine and one-half feet of the light standard," but "failed to warn him of the potential danger of the situation." *Id.* at 331. The appellate court disagreed, holding that "the proximity of the power line to the light standard" was not a premises defect, and that the plaintiff's injuries were instead "caused by the performance of his duties in painting the light [poles]." *Id.* at 333. Thus, the owner did not owe a duty to the plaintiff absent evidence that the owner controlled the details of the plaintiff's work. *Id*. at 333–34.

Applying these authorities here, the summary judgment record does not show that the proximity of the waste bins to the overhead power lines was an existing premises defect created through some means unrelated to the injured party or his employer. *See Phonoscope*, 2004 WL 1172900, at *4; *McCaughtry*, 981 S.W.2d at 333–34. Instead, the danger was activated when the Bringas brothers began the work of swapping out the waste bins at night. *See id.* Accordingly, we hold this is a category-two premises defect that requires proof that Oxy retained the right of

control, or exercised control over, the Bringas brothers' work before a duty may be imposed. *See Coastal Marine*, 988 S.W.2d at 225–26.

## 2. Oxy did not have a contractual right of control and did not actually exercise control over the work

Because this is a category-two case, Oxy owed no duty to the Bringas brothers unless Oxy had a contractual right to control, or exercised control, over the means, methods, or details of their work in swapping out the waste bins. *See JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021) (duty arises in premises defect case if control retained or exercised by defendant relates to "condition or activity that caused the injury" and extends to "the means, methods, or details of the independent contractor's work"). It is undisputed that Oxy did not have a contract with the Bringas brothers. *See Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 507, 515 (Tex. 2022) (element of retained right of control was negated where premises owner and subcontractor did not have any contract); *Coastal Marine*, 988 S.W.2d at 226 (same). And Oxy's Master Services Agreement with Petro Waste disclaimed any right of Oxy to control the means, methods, or details of Petro Waste's work. The MSA provides that Petro Waste "is an independent contractor, and neither [it] nor any of its . . . permitted subcontractors shall be considered, for any purpose, to be an employee, agent, or servant of [Oxy] or its affiliates." Further, the MSA states:

> Any provision in this Agreement whereby [Oxy] or [Oxy's] representatives would otherwise have the right to direct Contractor as to the manner of performing the Work shall be interpreted as meaning

that Contractor shall follow the wishes of [Oxy] in the results to be achieved and not in the means whereby the Work is to be accomplished.

Such language negates any contractual right of Oxy to control the Bringas brothers' work. *See, e.g.*, *JLB Builders*, 622 S.W.3d at 869–70 (holding similar contract language did not give general contractor the contractual right to control the work of its subcontractor); *Bright*, 89 S.W.3d at 606–08 (Dow did not have right to control Gulf States' work when contract stated Gulf States was "independent contractor" and any control granted to Dow would be over "the results of the work only").

Instead, the Bringas brothers argue that Oxy exercised "actual" control over how they performed their work because Oxy controlled the worksite or some details of that work. "Actual control is not established by evidence showing that the premises owner maintained general control of the facilities." *Union Carbide Corp. v. Smith*, 313 S.W.3d 370, 375 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). To exercise control, the premises owner must have the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor is not entirely free to do the work his own way. *See Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999). In other words, the control "must extend to the 'operative detail' of the contractor's work." *Ellwood*, 214 S.W.3d at 700 (quoting *Chi Energy, Inc. v. Urias*, 156 S.W.3d 873, 880 (Tex. App.—El Paso 2005, pet. denied)). Similarly, control is

22

not established by evidence that the defendant recommended a safe manner for an independent contractor's employees to perform their work or forbade them from performing work in an unsafe way. *See Ellwood*, 214 S.W.3d at 702–03.

In support of its contention that it did not exercise control over the Bringas brothers' work, Oxy cites summary judgment evidence that no one from Oxy was present at the unmanned Barilla Draw when the Bringas brothers performed their work. Only the Bringas brothers were there. According to Renee, when they arrived at the Barilla Draw, his brothers decided where to unload the new bins and how far to back up the trucks to retrieve the old bins. Additionally, as the operator of the controls for the trailer that touched the power line, Renee decided how high the trailer should be lifted.

The Bringas brothers had no communications with and received no instructions from Oxy. Benjamin testified that he did not talk to anyone at Oxy before he went to the Barilla Draw, that nobody gave him instructions about the work he was to perform, and that the only person he spoke with was the subcontractor's dispatcher, Zapata, who provided the locations of the Oxy facilities where the bins were to be swapped. Benjamin specifically did not recall being given any instructions other than the location of the bins that he was dispatched to retrieve. He acknowledged that he made the decision to go to the Barilla Draw at night. As for the timing of the Bringas brothers' work, Zapata testified:

Q. Okay. Now, when you provided these jobs to Benjamin, did you tell him that there was a deadline for this work?

A. I don't think there was a deadline.

Q. Okay. And did you tell him that he needed to perform the work at any specific Oxy facility first or in any certain order.

A. I don't think I did.

Q. Okay. And so once Benjamin received the text message that had four Oxy facilities and the GPS coordinates on it, was he, you know, free to determine in what order to do that work?

A. Yes, ma'am.

Q. And was he responsible or in charge of deciding, you know, what time to do that work?

. . .

A. I believe so.

In this regard, this case is analogous to the Texas Supreme Court's decision in *Energen*, a Chapter 95 case considering whether the premises owner had shown that it did not exercise or retain control over the way the injured plaintiff's work was performed. *Energen*, 642 S.W.3d at 513–15. There, the injured plaintiff was an employee of a subcontractor (Elite Drilling) who was supervising the drilling of a water well on Energen's premises, and he admitted "that he had never talked to anyone with Energen." 642 S.W.3d at 515. The plaintiff likewise testified that the "only entity from which he received information both before and after commencing drilling work on the water well was Dubose," the entity that had subcontracted the work to Elite Drilling. *Id.* The Supreme Court held that these facts established that

24

Energen did not actually exercise control over the plaintiff's work and thus owed no duty to the plaintiff. *Id.* at 515–16.

The Bringas brothers respond that Oxy still exercised control by "working with multiple contractors and deciding to locate waste bins perilously close to power lines with the assistance of one contractor, then approving that this work to be done in the middle of the night at an unlighted location." Even viewing the evidence in the light most favorable to the Bringas brothers as raising a fact issue on Oxy's involvement in the placement of the waste bins at the Barilla Draw, that is not a material fact issue by itself. *See Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 433 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (mere existence of fact question cannot preclude summary judgment; fact must be material to the claims for which summary judgment is sought). The material fact issue is whether Oxy exercised any control over the Bringas brothers' work swapping the waste bins out seven months later. The case law rejects the notion that a premises owner who merely directs when and where work is to be performed exercises control over the means or details of an independent contractor's work. *See, e.g., Energen*, 642 S.W.3d at 515; *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 792 (Tex. 2006); *Darden v. Hous. Lighting & Power Co.*, 936 S.W.2d 25, 26–27 (Tex. App.—San Antonio 1996, no writ).

On this issue, *Darden*, a case Oxy cites, is instructive. In *Darden*, the plaintiff brought a negligence action to recover for personal injuries received in an electrical

25

accident on a job site owned by Perry Homes. *Darden*, 936 S.W.2d at 26. The plaintiff was delivering materials on behalf of his employer, an independent contractor, when the truck-mounted boom he operated contacted a high-voltage overhead power line, resulting in injuries. *Id.* Eight months earlier, a superintendent for Perry Homes had directed Darden to where he wanted the materials dropped. *Id.* When Darden informed the superintendent that this would take him under the power lines, the superintendent responded, "Do the best you can." *Id.* That was the extent of control exercised by Perry Homes over Darden's work, and the appellate court concluded it was not enough to raise a fact issue on Perry Home's legal duty. *Id.* at 26–27. Similarly, here, even if Oxy directed where the waste bins were initially placed, that is no evidence Oxy exercised control over the Bringas brothers' work in swapping out those waste bins seven months later. *See id.*; *see also Energen*, 642 S.W.3d at 515 (directing when and where work will be done does not raise a fact issue on actual exercise of control).

The Bringas brothers also argue that Oxy exercised control over the details of their work by "green lighting" or "approving that this work [should] be done in the middle of the night at an unlighted location." We note first the testimony from Oxy's corporate representative that Oxy did not know "when [the Bringas brothers] were coming," was "unaware that they were coming when they did," and "would not have expected them to come out when they did, at night." Another Oxy employee—

26

Raymond Chavez—who was contacted by Petro Waste's dispatcher on the night of the incident to approve manifests for work performed at different Oxy facilities, testified that he was not told any work was going to performed in the dark and that he did not approve of any work to be done at the Barilla Draw.

According to the Bringas brothers, this evidence at most raises a fact issue as to whether Oxy knew of and required the timing of the work. They rely on several pieces of evidence, including testimony from Johannes Kohn (from Petro Waste's successor Waste Management) that when Petro Waste asked Oxy if it could swap out the bins, Oxy "agree[d] to it and . . . gave us the green light to go out and swap the boxes." Although Kohn admitted he did not know what Oxy knew before Benjamin was electrocuted, Kohn concluded that Oxy should have known that the work would be performed at night:

> Q. Okay. Now, earlier you testified that . . . Oxy should have known that the work was being performed at night. Do you recall that testimony?
>
> A. Yeah. So I think what I was saying was that it's not uncommon for us to perform work at night, whether it's for Oxy or for other E&Ps.
>
> Q. Okay. But . . . you don't have any actual knowledge about what Oxy knew on the night of September 19th or the early morning hours of September 20th, correct?
>
> A. That is correct. I do not.
>
> Q. And we don't see any reference on the dispatch log to any communications with Oxy about work being performed at the Barilla Draw compressor station, correct?

27

A. Yeah. The only reference that we have on the log is that we're waiting . . . on a[n] email from Raymond for manifest approval.

Q. . . . [A]nd, in fact, while it might have been common for Waste Management to perform work at night, this September 19th work that Waste Management was performing for Oxy was actually the first time that Waste Management had done work for Oxy in the Pecos area, correct?

A. I can't say whether it was the only time or the first time, but I can say as in regards to these roll-off boxes, this was definitely the first time between February when they're delivered and September when they were received or picked up — sorry, swapped out.

Q. Right. Okay. And so . . . that's what I'm getting at is that it's not as though Oxy and Waste Management had been performing a long history of work together with roll-off boxes in the Pecos area. This, in fact, was the first project of that nature.

A. That is correct.

Dennis Romo, who hired the Bringas brothers for the work after being contacted by Zapata, agreed that Oxy should have known the work would occur at night. He explained:

4. On September 19, 2019, [the Bringas brothers] were provided with a list of Oxy facilities that had industrial waste bins that needed to be swapped out. My understanding is that Oxy wanted this work to be completed "ASAP" and that it needed to be completed by the following day.

. . .

8. Any suggestion that Oxy . . . did not know that [the Bringas brothers] would be visiting Oxy facilities after sunset is absurd. Drivers who serviced Petro Waste's customers did so on a 24/7 basis and drivers routinely serviced Petro Waste's customers at night. Oxy was aware or certainly should have been aware that [the Bringas brothers] would be entering Oxy's property at night because Oxy wanted their industrial waste bins to be swapped out by the next day.

28

Zapata also confirmed in his deposition testimony that waste haulers were "constantly working during nights." But he also said that working at night is more dangerous and that, as a waste hauler, he understood that it was part of his job to "assess the site for potential hazards."

Even if this evidence raised a fact issue on Oxy's general approval of the work and knowledge when it might occur, it does not raise a fact issue that Oxy directed the work to occur at night. *Cf. Gonzalez*, 463 S.W.3d at 506 (owner "can direct when and where an independent contractor does the work and can request information and reports about the work," but does not become liable for independent contractor's work unless owner controls the details or methods of work so much that independent contractor cannot perform work as it chooses (quoting *Fifth Club*, 196 S.W.3d at 792)). That is, there is no evidence that this general approval by Oxy of the waste bin swap outs was a directive for the Bringas brothers to perform the work at a specific time or in darkness—a fact the Bringas brothers themselves admit through Benjamin's acknowledgment that he had no communication with Oxy and made the decision himself to perform the work when it was dark.

We therefore conclude that Oxy proved that it did not retain a contractual right of control, or exercise actual control over the Bringas brothers' work at the Barilla Draw, and the Bringas brothers' evidence did not raise a material fact issue to the contrary.

29

We sustain Oxy's first issue.[5]

## D. Oxy is entitled to summary judgment on the other claims for negligent activity and negligence per se

Oxy contends that is also entitled to summary judgment on the claims alleging a negligent activity and negligence per se. The Bringas brothers respond that those claims are not within the scope of this permissive appeal because the controlling questions of law identified by the trial court related only to the premises defect claim. Considering the Texas Supreme Court's instruction in *Elephant Insurance* that "permissive appeals are resolved according to the same principles as any other appeal, including addressing all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue," we disagree. *Elephant Ins.*, 644 S.W.3d at 147 (noting that while a controlling legal question is essential to securing a permissive appeal, it is the order itself that is on appeal).

The foremost disputed issue in the summary judgment proceedings was whether Oxy owed any duty to the Bringas brothers under any negligence theory. Although the trial court certified questions related to the duty element of a premises defect claim, it denied Oxy's motion in its entirety. Our conclusion that the Bringas brothers assert a category-two premises defect but that Oxy did not owe a duty

---

[5] Because we sustain Oxy's first issue, we do not reach its second issue challenging the openness and obviousness of the alleged dangerous condition, which we construe as an independent no-duty ground for summary judgment on the premises defect claim. *See* TEX. R. APP. P. 47.1.

because it did not retain or exercise control is to the exclusion of the Bringas brothers' other negligence theories. *E.g.*, *Zarzana v. Ashley*, 218 S.W.3d 152, 161 (Tex. App.—Houston [14th Dist.] 2007, pet. stricken) ("[W]here a defendant conclusively disproves an element common among pleaded causes of action, summary judgment is proper."). That is, for reasons explained below, our conclusion necessarily precludes the negligent activity and negligence per se claims because they depend on the same factual assertions that we have concluded Oxy disproved.

### 1. Negligent Activity

As we have already stated, when a plaintiff pursues negligent activity and premises defect claims against a property owner, Texas law may permit recovery under one or the other theory but not both if they are based on the same set of facts. *See Halstead*, 650 S.W.3d at 714. That is the case here. As the basis for their negligent activity theory, the Bringas brothers point to Oxy's decision to "green light" the "work to occur at night, during hours that Oxy knew there would be insufficient lighting for [them] to safely accomplish the job." Even if this was affirmative, contemporaneous conduct on Oxy's part, which is something we do not decide, it is the same alleged conduct that underlies the premises defect claim. *See Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (holding recovery on negligent activity theory requires plaintiff be harmed by or as contemporaneous result of activity itself). Accordingly, it will not support a separate negligent activity

31

claim. *See id.*; *see also Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 389 (Tex. 2016) ("[I]f a claim is properly determined to be one for premises defect, a plaintiff cannot circumvent the true nature of the claim by pleading it as one for general negligence. . . .").

## 2. Negligence per se

Our conclusion that Oxy proved that it did not exercise control over the Bringas brothers' work at the Barilla Draw also disposes of any negligence per se claim under Chapter 752 of the Health and Safety Code, which pertains to persons who engage in activities near high-voltage overhead lines. *See* TEX. HEALTH & SAFETY CODE §§ 752.001–.008. The Bringas brothers contend that the statute imposes a duty to provide a safe environment for work around energized power lines on the owner or operator of power lines and the person, entity, or organization "responsible" for the work, which they say is Oxy.

Section 752.003—entitled "Temporary Clearance of Lines"—requires 48 hours' notice and other safety precautions when certain functions or activities are performed within prescribed distances of high-voltage overhead lines.[6] *Id.*

---

[6]   Section 752.003 provides:

(a)   A person, firm, corporation, or association responsible for temporary work or a temporary activity or function closer to a high voltage overhead line than the distances prescribed in this chapter must notify the operator of the line at least 48 hours before the work begins.

§ 752.003(a). Before work is performed near high-voltage overhead lines, the owner or operator of the power lines and the person "responsible for the work" must negotiate and decide on protective measures to prevent contact between material, equipment, or the "person performing the work, activity, or function," among other things. *Id.* § 752.003(b). A person who does not guard against danger by contact with the line as prescribed by Section 752.003 may not "bring any part of a tool, equipment, machine, or material within six feet of a high voltage overhead line while performing the function or activity." *Id.* § 752.004(a)(2).

Chapter 752 does not define the "person . . . responsible for the work, activity, or function." *See id.* §§ 752.001, .003. Relying on decisions from other appellate courts, the Bringas brothers contend that a person who has some control over the work site is a person responsible for the work under Section 752.003. *See Oncor Elec. Delivery Co. v. Quintanilla*, No. 05-19-01331-CV, 2022 WL 9809712, at *9 (Tex. App.—Dallas Oct. 17, 2022, pet. denied) (mem. op.); *City of Austin v.*

---

(b)    A person, firm, corporation, or association may not begin the work, activity, or function under this section until the person, firm, corporation, or association responsible for the work, activity, or function and the owner or operator, or both, of the high voltage overhead line have negotiated a satisfactory mutual arrangement to provide temporary de-energization and grounding, temporary relocation or raising of the line, or temporary mechanical barriers to separate and prevent contact between the line and the material or equipment or the person performing the work, activity, or function.

TEX. HEALTH & SAFETY CODE § 752.003(a)–(b).

*Membreno Lopez*, 632 S.W.3d 200, 228 (Tex. App.—Austin 2021, pet. denied); *McCaughtry*, 981 S.W.2d at 334. We do not apply those authorities here because they are distinguishable, and this Court has adopted a different interpretation.

For instance, in *Quintanilla*, two excavation workers were electrocuted when a guy wire anchored in the hole they were excavating suddenly became energized. *See Quintanilla*, 2022 WL 9809712, at *1–2. The workers sued the electric company, claiming that a negligently installed insulator was too short to prevent the guy wire from becoming energized when it sagged onto an electrified jumper. *Id.* The electric company asserted that the workers' claims were barred by Chapter 752 because the workers were responsible for the work and failed to provide notice to and make mutual safety arrangements with the company before beginning work. *Id.*; *see also id.* at *7 (noting some courts have held, under doctrine of circular indemnity, that a plaintiff who violates Chapter 752 and is injured by contact with a high-voltage overhead line is barred from recovering damages from the line owner or operator). At trial, the jury made findings adverse to the electric company on its Chapter 752 defense. *Id.* at *7–8. On appeal, the electric company argued those findings were contrary to the evidence. *Id.* After noting Chapter 752 does not define responsibility for the work, the Dallas court evaluated the sufficiency point based on an unobjected-to jury charge instruction that:

> "Responsible for the work, activity, or function" means one who desires
> to temporarily carry on the work and who therefore exercises some

degree of control over the worksite. Factors to be considered to determine whether someone is responsible for the work, activity, or function include:

(1)     knowledge of the specific proposed location of the work;

(2)     participation in deciding where the work will be performed;

(3)     presence at the worksite;

(4)     involvement after hiring a contractor to perform services; and

(5)     ownership interest in the property where the work was conducted.

*Id.* at *9.

The Bringas brothers urge us to apply the same definition and factors here to conclude that a fact issue exists on whether Oxy is a "person, firm, corporation, or association responsible for the work, activity, or function." TEX. HEALTH & SAFETY CODE § 752.003. But as the Dallas court noted, "The definition and its factors do not come from the plain-language of Chapter 752 . . . ." *Id.* Because the charge was unobjected-to, the Dallas court had to measure the sufficiency of the evidence against the charge as given. *Id.* The court expressed no opinion on whether the charge submitted "accurately states Texas law." *Id.* Considering this context and the limited application of the five-factor test in *Quintanilla*, we decline to apply it here.

*Membreno Lopez* interpreted Chapter 752 in the context of another jury trial. The Austin court held that it was not error for the trial court to have instructed the jury that a "person responsible" may be one who has "some degree of control of the

work site within six feet of the high voltage overhead line." *Membreno Lopez*, 632 S.W.3d at 227. The court reasoned that "determining who is the 'party responsible' is a fact-specific inquiry that turns on who determines the location of the work and its proximity to a power line, an inquiry that in some cases will be informed by who controls the details of the work, such as the tools or equipment to be used and the manner in which they are to be used." *Id.* at 229.

This Court has adopted a construction of Section 752.003 that turns on control over the details of the work. *E.g.*, *Phonoscope*, 2004 WL 1172900, at *8; *Trail v. Friedrich*, 77 S.W.3d 508, 513 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). In *Trail*, the Court affirmed summary judgment for a building owner sued by an independent contractor injured by electrical wires while painting the roof of a feed store with a spray gun. *See Trail*, 77 S.W.3d at 513. The Court concluded that an owner may have some control over the work site, "yet nothing whatever to do with the work except to authorize it and pay the contractor." *Id.* at 512. And there, though the owner had control over the feed store, neither he nor any of his employees were present while the plaintiff was working. Nor did the owner observe the plaintiff's work or seek to direct it. *Id.* at 512–13. Because the owner had no right to direct the details of the plaintiff's work, he was not the "person responsible" under Chapter 752. *Id.* at 513. Rather, the injured plaintiff was responsible.

Two years later, in *Phonoscope*, the Court affirmed summary judgment for an easement owner who did not have supervisory control, and did not actually exercise control, over the details of the injured subcontractor's work near high-voltage lines. *Phonoscope*, 2004 WL 1172900, at *9–10. There, the Court disagreed with the injured subcontractor that the easement owner owed a non-delegable duty under Chapter 752 to notify the electrical utility of the fiber-optic-cabling work and ensure that the power lines were de-energized. *Id.* at *8–9. Although the owner told subcontractor to use the correct fiber-optic cable on the correct poles, the owner was not present when the injury occurred, did not own the bucket truck that hit the power line, and told no one how to use the truck or "string and lash the cable" while someone was in the bucket. *Id.* at *7. Relying on *Trail*, the Court concluded that the owner, who had no right to direct the details of the subcontractor's work and had not actually done so, was not the responsible party under Chapter 752. *Id.* at *9–10.

More recently, the Court reaffirmed its interpretation of Section 752.003 in *Buchan v. All. Communities, LLC*, No. 01-18-01088-CV, 2020 WL 3969670, at *4 (Tex. App.—Houston [1st Dist.] July 14, 2020, no pet.) (mem. op.). There, a property manager hired a general contractor to repair the exteriors of some apartment buildings, including painting, rotted-wood replacement, gutter and masonry repairs, and carpentry work. *Id.* at *1. The general contractor outsourced various portions of the work to subcontractors. *Id.* The subcontractor for the removal and replacement

37

of rotted wood, in turn, hired the plaintiff. *Id.* The plaintiff's role involved managing an extension ladder. *Id.* Because high-voltage lines ran behind a few of the apartment buildings and the perimeter fence was too close to the buildings to allow a proper angle for an extension ladder, the property manager warned the general contractor not to work in that area until it devised a safety plan. *Id.* Despite this warning and the general contractor's warning to the subcontractor, the plaintiff was working near the overhead lines when the ladder contacted the lines, and he was electrocuted. *Id.* The plaintiff sued the property manager, and others, alleging negligence and negligence per se. *Id.* As here, the negligence claim was based on negligent activity and premises liability, and the negligence per se claim was based on the property manager's alleged failure to comply with Chapter 752. *Id.* Also as here, the property manager argued that it owed no duty to the plaintiff because it did not control the work he performed on the property and was not the person "responsible for the work" under Chapter 752. *Id.* at *2. This Court affirmed summary judgment for the property owner upon its conclusion that the property manager was not the "person responsible" under Chapter 752 because it was not contractually responsible and did not control the work and did not direct the tasks that the plaintiff performed. *Id.*

Applying this Court's own precedent, as we must, and for the reasons stated above with respect to the evidence that Oxy did not have a right to control and did not actually exercise control over the Bringas brothers' work, we reach the same

38

conclusion here that no fact issue precludes summary judgment under Chapter 752. Oxy proved that it did not retain a right of or exercise control over the Bringas brothers' work at the Barilla Draw, and the Bringas brothers' evidence did not raise a material fact issue to the contrary. Accordingly, the trial court erred by denying Oxy summary judgment on the negligent per se claim.

We sustain Oxy's third, fourth, and fifth issues.

## IV. Conclusion

We reverse the trial court's order denying summary judgment and render judgment dismissing the Bringas brothers' claims against Oxy.

Sarah Beth Landau
Justice

Panel consists of Justices Landau, Rivas-Molloy, and Farris.